Good morning, Your Honors, and may it please the Court, my name is David Gruen, and I'm here representing the appellant, Aids Healthcare Foundation. I'd like to reserve four minutes of my time today. Your Honors, Apexus is a government contractor that promised to provide sub-ceiling drug price... That's funny that you should say that. Promised. Do we know what the promise is? In other words, do we have the operative contract in front of us? Is that the 2019 version, or do we, or is it 2015 version? It was signed in 2014, unapplicable at least until 2019, so that falls within the statute of limitations period we're allowed to sue under. As far as the subsequent agreement, we did do a public records request at the time that we filed the lawsuit, but we were not able to get a copy in time to be able to attach it. So what we're working on here is the provision that is in the 2014... And you didn't ask us to take judicial notice of it? Of the... Are they different in relevant, in important relevant parts? My Your Honor, the point here is they're a government contractor that promised to provide sub-ceiling drug price negotiation services on behalf of AIDS Healthcare Foundation and other safety net medical providers that really rely on these sub-ceiling discounts to be able to use those savings to provide services to the indigent and the underprivileged. Now Apexus was not services on sub-ceiling pricing was something that it agreed to do contractually. Why doesn't contractually? Counsel, why doesn't ASTRA foreclose your claim? Glad you mentioned that, Your Honor. So there's really three main reasons that ASTRA does not foreclose the claim. And they're actually the reasons that the Justice Ginsburg really points out are kind of the main things that need to be analyzed here. So one of the first points is Justice Ginsburg was concerned about a party trying to, on a third-party basis, enforce a contractual provision that merely mirrors the statutory language of a statute that doesn't have a private right of action. Here that's not a concern because AIDS Healthcare Foundation is not trying to enforce 340B. The statutory language does not mirror the contract that we are suing under. It does not mirror the contractual provision that we are focused on. Two, Justice Ginsburg even noted that there's really a distinction that would have been made here if the parties in the ASTRA case had been suing on an independent contractual provision that was not part of a statutory obligation. She notes that as an important distinction in the opinion. And here, again, we are suing exactly that, exactly that distinction. We're suing on a separate contractual provision that is not part of 340B. And then finally, the court in ASTRA was very concerned where there's no private right of action, particularly here with 340B, where you've got kind of a complicated calculation that can be best done by HRSA or CMS to have a third party kind of stepping in and intent that these third party actions should proceed forward. I looked and, you know, there are things I think that maybe indicate the opposite, don't they? I see the court's point if you're looking towards the statute, but I'd ask the court instead to really analyze the contractual provision here. And I think the real question is, was there intent here to benefit AIDS Healthcare Foundation? And reading the actual contractual provision, and I think this is really important, the contractual provision says the purpose of it, the purpose of it is to provide all member entities the most advantageous subceiling pricing. So this goes beyond even the pharmaceutical pricing agreements. But I think with regards to the statute, I think that Congress was looking at it from the point of view of the entities and the manufacturers, right, the providers of the drugs. I don't think that they contemplated with regards to the prime vendors. I mean, I think that's the difference, which would require a third party action, and that Congress did not sort of write into the statute, right? Well, going back to the Ninth Circuit case that was overturned by the Supreme Court in Astra, you know, the Ninth Circuit did an analysis of the intended beneficiary and found that in the pharmaceutical pricing agreements, there could be really no other conclusion but to determine that they were intended beneficiaries. But to your point, the Supreme Court said, well, where the statutory language mirrors the contractual provision, that's the situation where we're not allowed to make that inference. But they also said more than that. They said that, you know, we have this dispute resolution provision, and that gives us an understanding of what Congress was thinking here. Why should we look at that provision and say exactly the same thing with regards to what you're trying to do? So I think the dispute resolution program that's been set up really highlights the issue here, which is the dispute resolution program only covers ceiling pricing. Why is that? It covers ceiling pricing because that's the only thing that 340B is really regulating here. That's the only obligation that comes from 340B. And it's telling in Apexis' briefing, they admit that if AHF wanted to go and use the administrative dispute resolution process that's outlined and allowed by 340B, we would not be able to bring this claim there. And the reason we would not be able to bring this claim there is because we are not arguing about ceiling prices, which is the statutory obligation under 340B. What we're arguing about is the negotiation of subceiling pricing. Subceiling pricing is axiomatically not part of 340B. But if we think the subceiling price negotiation term in the HRSA Apex agreement is a statutory obligation, do any of your claims survive, Astra? And so how? Yeah, so the 17200 claim would still be able to survive. Maybe not on the two other components, a fraudulent component and an unfair component. And this claim could certainly survive on the unfair or the fraudulent component. The reason for that is this isn't simply the same as a breach of contract cause of action being regurgitated into a 17200 claim. What we have here is a government contractor that is not just not doing what it's supposed to do under the contract. It's actually working towards benefiting its parent company. And that's really the issue here. We have a government contractor that has agreed, and this is an important distinction going back to the actual contract. They've agreed to provide all member entities the most advantageous subceiling pricing. And the reason I think that's really important is this isn't a contractual provision where it just benefits the public generally, which I know is a concern, or even in the pharmaceutical pricing agreements where it clearly benefits... The real issue here is they're acting kind of as an agent. What HRSA is saying is, hey, these entities on their own, why would a pharmaceutical company just agree to provide them subceiling pricing? The pharmaceutical company is not going to agree to provide one entity subceiling pricing. And 340B doesn't contemplate how you're actually going to be able to negotiate that. So what HRSA has done is contracted, only through a contract, not through 340B, with Apexis to act as an agent, to act as a broker on behalf of these safety net medical providers like AHF to negotiate on our behalf. So this is more than just an incidental benefit. Let me ask you, though, because it seems like ASTRA was concerned with the consequences of permitting a suit in a 340B context, particularly given the interrelated nature of 340B and the Medicaid drug rebate program. So if you could explain for me or play it out for me here, if every covered entity can sue the prime vendor for failing to negotiate lower prices, where does that lead? So if I can, I'd like to address that in kind of two different paths. First, I'll address it in the third-party beneficiary path, and then I'd also like the opportunity to address it on the 17200 claim path. On the 340B, you know, or on the third-party beneficiary path, the reason that this is less of a concern is the real concern for Congress, at least my reading of it, is that when it comes to calculating a ceiling price, this is information that the covered entities don't necessarily even have. This is information to figure this out that HRSA and CMS have. So to allow them to sue on a third-party beneficiary basis, how would they get this information? They'd be getting information that, at least at the time, you know, Congress was concerned, Congress did not really intend for them to have. In this context, again, we're not suing under 340B. We're suing under a simple contractual provision, where if Apexis was actually doing what it was supposed to be doing, you know, there wouldn't be an issue here. So this isn't going to step on HRSA's toes because, you know, HRSA and CMS are the experts in figuring out ceiling pricing. But the language in ASTRA was that they were, I mean, concerned that permitting suits from 340B entities would undermine these efforts, HHS's efforts, to administer both Medicaid and Section 340B harmoniously or, and on a uniform nationwide basis, given the interdependent nature of the two program requirements. So I just, it seems like that means an adjudication of rights under one program must proceed, as ASTRA said, with an eye towards any implications for the other. So I'm trying to see how you get out from under that. So I think maybe I would agree with the court on that point if sub-ceiling pricing was set by the 340B statute, but it's not. And again, our complaint isn't actually on the price. It's really that Apexis isn't doing its job under a contractual provision, which I think is, again, very different. But to hit the 17200 point, you know, the case law, and I think it's laid out pretty well in the Zang case, which we cited, when it comes to 17200 claims, the reason that you're still allowed to bring these claims is it's an independent and direct cause of action. And the damages, there really are no damages, right? You're allowed to have injunctive relief, and you're allowed to have disgorgement. So the concern, you know, of all of these entities, you know, suing over pricing, it's not really an issue here. But if we think you're not an intended beneficiary of the HRSA Apexis contract, how do you have standing outside the contract? Well, again, two points, Your Honor. So with regard to who is an intended beneficiary, just looking, again, at federal law on this, I mean, we're supposed to be looking at the contract and the clear intent there. And again, this isn't just, you know, some incidental thing that we benefit from. They're actually, Apexis is supposed to be acting as our agent on our behalf to negotiate these prices. Well, but then isn't the lawsuit a different kind of a lawsuit, really, where you're more like an APA kind of a challenge here, saying that, hey, you, agency, are not doing what you authorized to do. You've gone sort of beyond that. You've delegated your authority to this prime vendor to negotiate, whereas you're supposed to negotiate this, and there's no way to enforce. I mean, what's, isn't, then that's a different kind of a case, isn't it? I think it could be. And I think that goes back to the point of the court's dismissal of our case, the underlying court. But my point is that you're trying to put it into this other area where there's no sort of enforceability, it seems, perhaps, and there's no ability for these third-party actions. Well, taking the court at its hypothetical, on the 17-200 claim, again, it would still survive because 17-200 claims are not concerned, you know, necessarily about whether this is just a breach of contract and trying to reformulate it. 17-200 is really about unfairness. It's a completely separate and direct theory of liability, and the case law on that supports that even where a statute does not provide a private right of action, if there is unfairness, if the public or entities here, like AHF, are being misled, that is an independent reason to be able to, you know, force the government contractor to- And your best authority for that? Because I'm just not sure that's enough. I would say the Zane case, like I said, I believe that lays that out well. Because, again, disgorgement- Yeah. I apologize. No, no, go ahead. You wanted some time for rebuttal, but I wanted to ask you on the leave to amend issue, how would the facts that you have indicated that you can allege support your UCL claim? Right. I think the facts that are laid out, the additional facts in the opposition to the 12B6 motion really show this isn't just a breach of contract claim. This is a government entity that, you know, led the public to believe that they were a non-profit, has since become a for-profit, is not just failing to negotiate on behalf of covered entities, but is actually kind of sitting on their hands so that way its parent company can benefit from that. We've got instances in there that have been mentioned in the facts of abilities for them to be able to get pricing below VA level and just not acting on that. So, again, that's not you didn't negotiate well enough, which I keep trying to frame it in that manner. It's not negotiating well enough. It's about actually just doing your job, period. But again- What would you add? What's the amend? What would you add to the amend? Because you're restating, I think, your current- Right. So if the court looked at our multiple pages of additional allegations that we would have made at that time, and there's even more we could make now. So, again, I think the real idea here is cases should be determined on the merits, and we should be given the opportunity to obtain enough facts to be able to do that, to be able to plead this case and be able to have this written on the record. Good morning. May it please the court, Karen Baumholtz on behalf of the respondent, Apexis LLC. I think let me begin by just laying out my argument. The key to understanding all aspects of this case is to understand the statutory scheme itself. So I'll address first all of the reasons why ASTRA, and even in the absence of ASTRA, there's no ability for a covered entity to enforce Apexis's contract with the government. Because whether under ASTRA or the reasoning that led to ASTRA, there just cannot be, to your Honor's point, 13,000 covered entities like AHF who can individually bring lawsuits all at once. Then I'll speak- So I understand that our president is skeptical of allowing third-party beneficiary lawsuits, seeking to enforce obligations in government contracts. But here it seems like we can infer an intent to benefit covered entities because that seems to be the sole purpose of the subsealing pricing term. So why is that wrong? Sure. And let me come at that a few ways, your Honor. First, I think it would run directly contrary to ASTRA. So let me start with that. Can you answer part of a question first, though? You agree that they are the intended beneficiaries, correct? I agree that they are incidental beneficiaries. I do not- And what ASTRA said is that there is a critical distinction, and contrary to this Court's holding in County of Santa Clara that is ASTRA, a critical distinction between an intention to benefit a third party, like the 13,000 covered entities that were at issue in ASTRA and that are at issue here. There are 13,000 covered entities, more than. And a distinction between that, an intention to benefit them, and an intention to give each of those third parties the right to enforce that intention. That's the language of ASTRA at page 118. And what, where we got to in ASTRA, although- Counsel, let me, I apologize for interrupting, but I have a specific question related to what ASTRA held. ASTRA, I'm sorry. I know that it states that the third party beneficiary suit in that case did not allege the manufacturer, and quote, violated any independent substantive obligation arising only from the contract between the manufacturer and HRSA. Counsel has already stated that that's what he's hinging his position on, that ASTRA doesn't apply, because here that's exactly what AHS is trying to do. So, or AHF. Why is that not accurate? And the reason why is that we have to look through the statutory scheme. The statutory scheme actually requires HHS to set up a prime vendor program. And the prime vendor contract itself states this is the way in which HHS is enacting that program. They could have done it by regulations. They could have done it by contract. The whole thing arises from that subsection of Section 340B that required the development of the prime vendor program. Where does it allow it to delegate its authority to negotiate the prices? Where's the authority that- Oh, so that's a really important point, Your Honor. The ceiling price is set by the regulations and the statutes. To get to a sub-ceiling price, you first have to determine what the ceiling price is, and the same process to determine what the ceiling price is is going to apply here. It's going to apply under ASTRA to the manufacturers. It's a regulatory scheme that ASTRA said is a very complex enterprise. You still have to do that here. The question is not that there was a delegation to get sub-ceiling pricing. What the prime vendor agreement does is make our client the prime vendor. To Your Honor's question earlier, the 2019 contract is actually in the record. It's at SER 11 to 21. The entire contract? The entire 2019 contract. It requires a PECSIS agreed with the government to be the prime vendor and to develop, maintain, and coordinate a program capable of distribution, facilitation, and other activities in support of the Section 340B program. It goes on then to talk about negotiating services with the purpose of providing all member entities the most advantageous pricing on outpatient covered drugs that may not exceed the 340B ceiling. You cannot get to sub-ceiling pricing without determining the ceiling pricing. And to Your Honor's point earlier about ASTRA and all of the concerns that led ASTRA to entities, it was because there was this very complex enterprise in determining it. Counsel, how are prime vendors held responsible then if they don't do their job? There's only one prime vendor here, Your Honor. And I want to be clear. The prime vendor program arises out of Section 340B. And the answer to your question of how does HRSA, who regulates this there is an ability to enforce ceiling pricing under the entire 2010 amendment that then led to later regulations. ASTRA spoke to that in part. And HRSA... Have they really done that? I mean... I'm sorry, Your Honor, has who? Have they done what you just said, like their obligation to, you know, oversee? Yes. Absolutely. HRSA is in contact with our client all the time. They run audits. They have, and as the Supreme Court pointed out in ASTRA, before there was enforcement scheme to deal with the PPAs, HRSA and HHS were doing that on an informal basis. That's the language of ASTRA there. And the reason... No, Your Honor. Go ahead. Everything that Your Honor said earlier about ASTRA and its reasoning, that you have to, that reason why ASTRA came out the way it did was because the court at 119 and 120 said Congress did not intend to spread the enforcement burden to 13,000 covered entities and that the courts were not equipped in the way that HRSA was to balance the competing interests on the Medicaid program. That's an important point, but I'm trying to figure out if that point outweighs, you know, is within the class of clearly intended beneficiaries. And I don't know if you answered that yes or no. Well, the answer is that were they intended to benefit from? Sure, but... Because it's hard, just for me, it's hard to discern a purpose of the subsealing price provision other than to benefit covered entities. The... Well, in just the same way, in ASTRA, the entire, all of the people who were intended to be benefited were the covered entities by the PPAs. There was an intent in both cases to benefit all of these safety net providers, not just AHF, but all of the other safety net providers that the program serves. But what ASTRA said is you have to distinguish between an intent to benefit, which was clearly the case in ASTRA, and probably clearly the case here, and an intent to allow enforcement. And what ASTRA came out as, the reason why ASTRA came out as it did is it said all of this is for HRSA and AHS, excuse me. But ASTRA, I mean, would you agree, focused on the fact that Santa Clara County's suit alleged only that the manufacturers charged more than the statutory sealing price, not that they violated any independent substantive obligation arising only from the contract at issue. And so why isn't the sub sealing price negotiation provision an independent substantive obligation? Sure. And the answer is, yes, I agree with you that ASTRA focused on that because those were the facts of ASTRA. No question. But all of the reasoning of ASTRA, and then to further answer your question, Your Honor, at least five independent reasons why it still applies here. First, as I mentioned earlier, on its face, Section 340B required HHS to develop this program. And second, as I mentioned earlier, on the face of the PVP contract, it's a term in this contract that this is how HHS is going to develop that program. ASTRA said the programs were sourced in Section 340B, and for that reason, a private right of action was barred. Third, and maybe most importantly, the very reason why all of ASTRA's reasoning has to apply here is that to enforce the purported obligation to negotiate sub sealing pricing, you have to determine what the sealing is. And that is under ASTRA for HHS and HRSA to decide. But here, the argument is that you all have agreed to do something more. And that's what they're trying to enforce. Well, sure. But I mean, the first step in that would be to say we didn't get sub sealing pricing. And the first step in that would be to determine what's the sealing. And what ASTRA explained, and these regulations are very complex, is it's a very complex enterprise to even start to determine what that sealing price is. Because there's all kinds of ways that you deal with the manufacturing price and you get there. So to even talk about whether or not there was not a sub sealing price, you have to start with whether there's a sealing price. So what is the remedy? And I think this is what Judge Mendoza was asking previously, but what is the remedy when the prime vendor fails to fulfill its statutory obligations? HRSA is the answer, Your Honor. And again, is this all the people who are contacting? HRSA runs this entire program just as it runs the entire PPA program. HRSA has the ability to audit and to tell Apexis to do different things. AHF has the ability to bring this to HRSA, to bring it to Apexis, which they have done in the past, as they plead and footnote in their complaint. They raised a concern and Apexis responded. Apexis will not get another prime contract if it's not doing what HRSA wants it to do. And in fact, when the new, this is not part of this record, but when Apexis was re-awarded the contract, the only covered entity to have complained was AHF. They complained. HRSA heard that complaint and decided to go forward. Let me come back to your question about ASTRA, just one more thing. ASTRA also reasoned that Section 340B's ban on disclosure of pricing information was wholly incompatible with a private right of action for the 13,000 covered entities, because Congress would not have made that confidential if they were intending for the very information necessary to determine whether their asserted rights have been violated to be kept confidential. And so if I can wrap up ASTRA this way and then move on to the UCL, we agree that ASTRA wouldn't permit AHF to come in here and sue AHF to enforce the ceiling. But it would be very incongruous with ASTRA to hold that they could come in here and enforce a sub-ceiling price. So with that, unless the... Well, let me ask you, it seemed like ASTRA pointed to HRSA's dispute resolution authority, but it seems like that authority is limited to resolving disputes between drug manufacturers and covered entities. So how would the suit here disrupt HRSA's authority? Sure. At the time of in effect. At the time of ASTRA, and ASTRA, the Supreme Court points this out, at the time ASTRA was decided, it was still a very informal process by HRSA to decide how to deal with these things. And in response to that, to deal with the complaints about ceiling pricing not being met, and in response to that, Congress amended the statute in 2010 to provide for a more robust regulatory scheme. So under ASTRA, the informal process and the whole point of ASTRA was this is all within the scope of HHS and HRSA. You can't have, and this is no different, all of these covered entities going into all these different courts all over the country and saying, I want Apexis to have done one more negotiation here or one more negotiation there to have gotten the ceiling price that is set by regulation. All of the reasoning of ASTRA, whether ASTRA was, you know, technically focused on the identity of language, which by the way, there's no identity of language in the PPAs, but to enforce the statutes, the same reasoning applies with equal force here. Give me an example of a case that you think would fit under the ASTRA, what I'm going to obligation? Their haircutting example, something that does not arise from the actual statute, that is not about enforcing the Section 340B program, and what Section 340B says is that there has to be a development of a prime vendor program, and that prime vendor program, I read the language earlier, the 2019 contracts, is that we will do these things for the purpose of providing the most advantageous pricing that does not exceed the Section 340B ceiling. If I could turn to the UCL briefly. Thank you, Your Honor. First, before she turns, I'm sorry, before she does that, I do have a question. It's going back to what you said earlier. You said that if there's an issue, you know, we talk all the time, HRSA and our company talk all the time. What happens when there's a dispute between the two? What happens? Let's say that the agency says, we need you to do X, and you don't. What happens? Well, I think a couple of things could happen. One is, HRSA would not reaward the contract later. Okay, well that's, you know, however, how long are those contracts? That's a good question, Your Honor. I think it's five years. Okay, let's assume five years. Let's say it happens on day one of the fifth year. So that's their option? Well, no, we would work, I mean, our client works with HRSA all the time in terms of what needs to happen. No, right. Let's say you don't agree. Let's say you are not in agreement. They ask you to do X. You're not going to do X. What happens? What do you do at that point? I mean, what in practice gets done is they just continue to work it out. What could HRSA do? Go to court? Perhaps. Then why can't these other people go to court as well? Because they are not in privity of contract, and they are not intended beneficiaries enabled to enforce the contract under ASTRA and all of the cases that led there. So there is possibility in some other different contexts that they could bring suit. You know, Your Honor, I haven't given a lot of thoughts to that, so I'm a little bit uncomfortable. But, I mean, it is a contract between HRSA and Apexis. And if HRSA thought that there was no, that we were not breaching our obligations, presumably HRSA would have the ability to enforce that. Now, this is not unlike lots of other programs that benefit lots of other people, and they're intended to benefit lots of other people. But the question is not whether it's intended to benefit someone. It's whether they're intended to have the right to enforce. I would like for you to get to the UCL. Sure. Thank you, Your Honor. And so there I have three main points I'd like to cover very briefly. First, there was no argument about the UCL in the district court in opposition to our motion to throw away line. It's just they never developed any argument. And I think this court is aware there are three prongs to California's unfair competition law. Unfair, which CELTEC, that the parties have cited to you, held was essentially like an antitrust analysis. You can't just say, oh, it's unfair. I think that what they're doing is unfair. There's a whole analysis that would have needed to have been done in the district court and to this court to argue that they have a claim under the UCL. The fraudulent prong requires Rule 9B pleading, misrepresentation upon which they relied. They never even tried to allege this, much less argue it in the district court, much less argue it here. And they don't have the facts to be able to do that if we were to allow them to amend? I don't, and here's why. First, the case law is very clear, and we've that to the extent that they're talking about a breach of contract, which this is. It's one, albeit that arises from the statutory scheme, but a breach of contract cannot form the basis of a UCL claim. The case law is very clear, and we've given you all of those cases. Now, I think I heard counsel say that they are not asserting the unlawfulness prong of the UCL. I was prepared to address that, but it sounds like I don't need to. But simply, CELTEC held that the mere absence of a private right of action would not bar a UCL claim. Where there is a statutory scheme that bars a private right of action, you cannot dress it up like a UCL claim. So if the court agrees, as I believe it should with the district court and with Apexis here, that there's no private right of action for these covered entities to enforce the Section 340B pricing, then CELTEC and all of these other cases that have been cited to you tell you that a UCL claim can't work in and run around that. All of the cases that they've cited in their briefing to this court dealt with statutes where there was a private right of action in the underlying statute. So for that reason and all of the reasons we've discussed previously, a UCL claim would not survive even if they had made the argument, which, I mean, it's absent from the district court briefing. They cite Section 17-200, but they never develop it. If I may, I see I'm out of time, but if I may just have a couple of minutes to wrap up. We've also, of course, given the court other reasons to affirm that we're not dealt with in the district court, and I won't propose to spend too much time on this, but nothing they've said about leave to amend in their briefing here would cure any of the defects that exist under Twombly, ICBAL, ASTRA, all of those things. And we've also given you, and I won't cover it in any great length, but what they left out of their complaint in which we provided with the district court and the district court overruled their objections to, to be clear, in footnote one, was the contract between Apexis and AHF, which waived any liability. And so that is another reason to affirm. And just in conclusion, Apexis deals with 150 drug manufacturers, more than 13,000 covered entities, and thousands and thousands of drugs. It is in constant contact with HRSA, and as ASTRA said, it would be in sharp conflict with congressional intent to say that any covered entity could individually sue AHF for not enforcing that portion of Section 340B, which is the prime vendor program. There's no way to square allowing AHF to claim that it thinks Apexis should have done something different with the reasoning in ASTRA and this court's jurisprudence on incidental and intended beneficiaries. So unless the court has further questions, we would submit. Thank you. Thank you. So, Mr. Gruen, you have basically three and a half minutes on the clock. Because I gave Ms. Broomholt an extra minute and 45 seconds, if you need it, you can have that. I would definitely appreciate it, Your Honor. Okay, thank you. Thank you. First, I wanted to address Your Honor's point here. Apexis has had this contract for nearly 20 years. They've got pretty much a monopoly here, which is really the problem, is they get to just keep doing what they're doing, and nobody is really enforcing this or trying to stop them. Counsel also pointed out, you know, keeps mentioning that this subceiling pricing negotiation comes from 340B. Well, they say that they can go to court themselves when they have a disagreement with the agency. But they don't. And I think an important point here is HRSA, if they had a problem with us, you know, trying to have this, who could have stepped in in this action and did not? Counsel, let me ask for clarification. The question has become, are you an intended or an incidental beneficiary? What are you and what supports that? No, I think we're clearly, to me, an intended beneficiary. And again, that's reading the actual language here. This is not just that we get some benefit from it. Counsel admitted that we get benefit from it and we're an intended beneficiary. But I think the distinction she's trying to make is... No, she said incidental, is what she said. Okay, my apologies. Maybe I misheard. But again, they're supposed to be acting as our agent here. This goes above and where the government enters into something and you get some benefit from it. It's not simply that we're the public getting a benefit or even that we're clearly, from reading the language, an intended beneficiary. They're supposed to be acting as our agents here, negotiating on our behalf, using the power of the federal government to try to negotiate subceiling pricing in ways that individual entities are simply not going to be able to do on their own. So I also want to jump to... I'm not sure you answered her question. I'm sorry. Her question was, why are you the intended beneficiary? Then you said, well, they're supposed to act as our agents. Is there any other possible intended beneficiary? Looking at federal case law, Your Honor, again, no, there's no other language of the contract is the way that the federal courts, or at least the cases, say that it should be analyzed. And again, from the language there, there would be no other beneficiary but for the covered entities here. I hope that answers Your Honor's question. If it doesn't, I'm happy to... Well, I was just asking simply because Counsel for Apex keeps referring to AHF as an incidental beneficiary. Right, which personally I don't think is supported by the contract, I guess would be my response. I think any reasonable person reading the contract, again, this is my personal view, I think you read that, it's pretty clear that we're not only the intended beneficiary, but they're supposed to be operating on our behalf. Just in terms of the waiver argument that they raised, one, it's extrinsic evidence to the extent that the court wanted to consider extrinsic evidence. We should have been given the opportunity to conduct discovery on that. It should have been converted to a motion for summary judgment. We were not given that opportunity. But more importantly, even if the court does decide to look at the language here, I mean, it simply doesn't apply. I think it's very misleading what Apexis is trying to do here. They're using a waiver provision that uses the term 340B prime vendor agreements and trying to prime vendor agreements means the agreement between HRSA and Apexis, and it does not. And the way that we know that is it's actually a defined term in this agreement. If we go to the whereas sections on the front page, the third whereas says that it is, the definition of it, it's essentially to the pharmaceutical pricing agreements. So it's the agreements between, you know, Apexis and the pharmacies. It's a completely different contract, I guess is my point. So this whole waiver argument is kind of, I think it's very misleading, I guess would be my point on that. And I'd ask the court to check the definition section and recognize that it simply doesn't apply here. What page is that on? SER6, the third whereas. It says, whereas 340B prime vendor is authorized to directly or through its agents to execute 340B prime vendor agreements, here and after referred to as 340B prime vendor agreements. And then in the examples of the actual waiver, which is F, it's concerning failures of the vendor to furnish the drugs. In other words, if the pharmaceutical company that Apexis enters into a contract with does not vend the drugs in the way that they're supposed to or do what they're supposed to, AHF is not going to be able to sue them. But that's not what this is about. This is about suing Apexis for it not doing its job. Unless the court has any other questions. Thank you very much, Mr. Gruen and Ms. Bumholt for your oral argument presentations here today. This case, the AIDS Healthcare Foundation versus Apexis LLC is now submitted. And that concludes our oral argument calendar for today. And so we are adjourned. Thank you very much. This court for this session stands adjourned.
judges: MURGUIA, MENDOZA, ALBA